**Ryan P. EHLIS, et al., Plaintiffs,**

**v.**

**SHIRE RICHWOOD, INC. and Shire Pharmaceuticals Group, plc, Defendants.**

**Civil No. A2–00–134.**

United States District Court,
D. North Dakota,
Northeastern Division.

Nov. 13, 2002.

---

Richard A. Clapp, Erin M. Diaz, Pearson, Christensen, Clapp, Fiedler, Fisher & Jensen, Grand Forks, ND, Barry P. Hogan, Nilles Hansen & Davies, Ltd. Moorhead, MN, Andy Vickery, Arnold Anderson Vickery Law Office, Paul Waldner, Waldner & Associates, Houston, TX, for Plaintiffs.

Randall Shane Hanson, Patrick J. Maddock, Camrud, Maddock, Olson & Larson, Ltd, Grand Forks, ND, Joseph P. Thomas, Shannon J. Cook, Ulmer & Berne, Cincinnati, OH, for Defendants.

## MEMORANDUM AND ORDER

KLEIN, United States Magistrate Judge.

Plaintiffs filed this product liability, personal injury and wrongful death case against defendants, alleging that Ryan Ehlis's ("Ehlis") ingestion of Adderall®, a prescription pharmaceutical, was responsible for Ehlis's actions in taking the life of his five week old daughter Tyra. A hearing on the parties' cross motions for summary judgment was held on August 13, 2002. At the time of the hearing, the court took the matter under advisement. Approximately two weeks later a telephone conference was held for the purpose of scheduling. At that time the court advised the parties of its inclination to grant defendants' motion for summary judgment, dismissing the action entirely, obviating the need for trial. That inclination was solidified by further review and research, culminating in this order granting defendants' Motion for Summary Judgment.

Brief Factual Background

Ehlis was a student at the University of North Dakota. Because he was experiencing some difficulty with a class, Ehlis sought the assistance of Dr. Thomas Peterson, a licensed psychiatrist. Ehlis informed Dr. Peterson during an office visit that as a child he was diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) and had taken Ritalin. After an approximately 45 minute office visit, Dr. Peterson confirmed the diagnosis and prescribed Adderall®. Adderall® is the brand name of a Food and Drug Administration ("FDA") approved pharmaceutical containing amphetamine salts, manufactured and marketed for the treatment of

ADHD in children and narcolepsy in adults.

Ehlis took his first dose of Adderall® shortly after receiving the prescription. Apparently he took the second dose about four hours later. Ehlis testified that he took the dosage prescribed by Dr. Peterson on two subsequent days, but reduced the dosage because of the "strong" effect the medication had on him. Ehlis further stated that he took no medication on the weekend, and felt normal. Ehlis then testified that he resumed taking the medication as prescribed, until Friday morning of the following week, when he ingested the remaining pills of the 30 day prescription. His significant other and mother of his children, Angie Moreno ("Moreno"), testified somewhat to the contrary as to the amount of medication Ehlis was taking at any given time. Further, she told police that Ehlis was not acting himself the very first day he took Adderall®. She also testified that Ehlis would wake up frightened and she would give him his Adderall® to calm him down. At no time did either Ehlis or Moreno contact Dr. Peterson to discuss with him the symptoms Ehlis was experiencing from the medication.

Ehlis testified that he began experiencing delusions and hallucinations. He also claims he had several "out-of-body" experiences while taking the medication, including talking to his dead grandfather and talking with God. Ehlis claims that he shot his daughter, and then turned the gun on himself, on direct orders from God. Ehlis was charged with the murder of his daughter, but the charges were dismissed upon confirmation that Ehlis suffered from an "Amphetamine–Induced Psychotic Disorder" and did not have the requisite criminal responsibility.

Plaintiffs commenced this lawsuit against the manufacturers of Adderall®, alleging defendants knew that the drug Adderall® sometimes induces psychosis and failed to properly and adequately warn of the risks associated with its ingestion. In addition, plaintiffs assert that defendants engaged in illegal marketing and advertising of the drug, and promoted the drug containing hidden warnings.

Motion For Reconsideration of Order Granting Amendment

Defendants seek clarification of this court's order dated June 5, 2002 granting plaintiffs' motion to amend their complaint to add a claim of strict liability under §§ 519 and 520 of the Restatement (Second) of Torts, asserting that defendants are strictly liable because they engaged in an abnormally dangerous activity. The court ruled in favor of the plaintiffs, citing to *Freeman v. Hoffman–La Roche, Inc.*, 260 Neb. 552, 618 N.W.2d 827, 834–35 (2000), which contains an extensive discussion of the applicability of comment k to § 402 of the Restatement (Second). Defendants respectfully assert the court misconstrued the plaintiffs' claims and that the court's opinion addresses unavoidably unsafe products under the Restatement (Second) of Torts § 402A, comment k, whereas the plaintiffs' motion to amend addresses abnormally dangerous activities under §§ 519 and 520 of the Restatement. The defendants further assert that several courts have held these sections inapplicable to the manufacture and sale of pharmaceutical products, *Reeder v. Hammond*, 125 Mich.App. 223, 336 N.W.2d 3 (1983); *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (1978), although North Dakota has neither specifically adopted nor rejected the provisions. See *Wirth v. Mayrath Industries, Inc.*, 278 N.W.2d 789 (N.D.1979). Plaintiffs admit as much, stating, "Sections 519–520 of the Restatement (Second) have been adopted by many jurisdictions, and the best Erie prediction that can be made in the case at hand is that such sections

are also applicable in North Dakota." However, plaintiffs fail to cite to any cases which have specifically held §§ 519 and 520 are applicable to the sale and manufacture of pharmaceutical drugs.

The court has again reviewed the parties' pleadings, their submission with respect to plaintiffs' motion to amend, and the Freemen decision in its entirety. After careful consideration, the court is prepared to rescind its prior order granting the amendment permitting plaintiffs to assert a claim pursuant to §§ 519 and 520 of the Restatement (Second) of Torts. Plaintiffs' original complaint contained a claim for strict liability under § 402A. This court's order did nothing more than affirm plaintiff's right to proceed under that section, and suggested that comment k provides an affirmative defense rather than provides absolute immunity, which has been asserted by defendants. Further, defendants are essentially correct that the court's June 5 order does not specifically address whether §§ 519 and 520 form a basis for liability in this case. It is to this issue the court now turns.

Plaintiffs' amendment seeks to assert a claim that defendants are strictly liable for engaging in an "abnormally dangerous" or "ultrahazardous" activity pursuant §§ 519 and 520 of the Restatement (Second) of Torts. Section 519 provides:

§ 519. General Principle.

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

Section 520 contains the factors to be considered in determining whether an activity is abnormally dangerous. This section provides:

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) Existence of a high degree of risk harm to persons, land or chattels of others;

(b) Likelihood that the harm that results from it will be great;

(c) Inability to eliminate the risk by the exercise of reasonable care;

(d) Extent to which the activity is not a matter of common usage;

(e) Inappropriateness of the activity to the place where it is carried on; and

(f) Extent to which its value to the community is outweighed by its dangerous attributes.

As the court recognized in *Progar v. The Washington Hospital*, there are a multiplicity of situations in which absolute liability has been found to apply, ranging from blasting, an oil drilling situation not unlike dynamite blasting, dam breaking, the storage of explosives, and even against "one who suffered his baboon to escape." 49 Pa. D. & C.2d 485, 488–89 (1970). These types of cases all have a common thread. However, the application of absolute liability to the realm of pharmaceutical products is glaringly absent, and has specifically been refused in its application to the production of new drugs. See *Gaston v. Hunter*, 121 Ariz. 33, 48, 588 P.2d 326, 341 (1978) (The rules relating to "ultrahazardous" or "abnormally dangerous" activities are inapplicable to the "production of new drugs").

In *Reeder v. Hammond*, 125 Mich.App. 223, 336 N.W.2d 3, 6 (1983), cited by the defendants, plaintiffs appealed the trial court's denial of their motion to file a second amended complaint to add a new theory of liability (something defendants

argue plaintiffs are now attempting to do in this case). In Reeder, plaintiffs believed that if they could prove that the manufacture of the pharmaceutical Biphetamine and birth control pills constitutes an ultrahazardous activity, "then defendants owe a duty to the consumer to warn of any risks associated with the use of their products." The appellate court held, given the Michigan Supreme Court's decision in *Smith v. ER Squibb & Sons, Inc.,* 405 Mich. 79, 88, 273 N.W.2d 476, 479 (1979), the district court did not err in refusing the amendment "since the proffered theory of liability was without merit." *Reeder,* 125 Mich.App. at 230, 336 N.W.2d at 6. The Michigan Supreme Court in Smith took the analysis one step further and adopted the learned intermediary doctrine, stating that a manufacturer of a prescription drug has a legal duty only to warn the medical professional, not the patient, of any risks inherent in the use of the drug the manufacturer knows or should know exists. *Smith,* 405 Mich. at 88, 273 N.W.2d at 479. On that basis the plaintiffs' action was dismissed.

Having thus concluded that the amendment was improvidently granted, the court will now address the pending motions for summary judgment, noting that this court's adoption of the learned intermediary doctrine supplants the plaintiffs' motion to amend to assert a cause of action under §§ 519 and 520 in any event.

Summary Judgment Standard

Summary judgment is appropriate if there is not a genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment ... against a party failing to make a showing sufficient to establish the existence of an element es-sential to that party's case." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. If the moving party has supported its motion for summary judgment, the nonmoving party has an affirmative burden placed on it to go beyond the pleadings and show a genuine triable issue of fact. *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 271 (8th Cir.1992). However, the court considering a motion for summary judgment must view the evidence in the light most favorable to the nonmoving party who enjoys "the benefit of all reasonable inferences to be drawn from the facts." *Vacca v. Viacom Broadcasting of Missouri, Inc.,* 875 F.2d 1337, 1339 (8th Cir.1989) (citation omitted).

Summary judgment is improper if the court finds a genuine issue of material fact; however, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Commercial Union Insurance Co. v. Schmidt,* 967 F.2d 270, 271–72 (8th Cir.1992) (citation omitted). The issue is whether "the evidence is sufficient to allow a reasonable jury to return a verdict for the nonmoving party." *Landon v. Northwest Airlines, Inc.,* 72 F.3d 620, 624 (8th Cir.1995).

Discussion

I. Plaintiffs' Motion for Partial Summary Judgment.

Plaintiffs assert there are no material facts in dispute and they are entitled to judgment as a matter of law. Plaintiffs contend that Shire is "at fault" pursuant to N.D. Cent.Code § 28–01.3–01; because Ehlis was unaware of the danger posed by Adderall®, the product is unreasonably dangerous. Because the product is unreasonably dangerous, Shire is strictly liable. Alternatively plaintiffs do argue the warnings as to Ehlis were insufficient, asserting that summary judgment on the failure to warn theory would also be appropriate.

Plaintiffs also anticipate defendants' learned intermediary doctrine defense, asserting the theory "applies only to the failure to warn/marketing defect theory, and has nothing to do with the over-riding concept of product 'defect' under other theories of liability." Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment, at 8 n. 6.

Defendants contend plaintiffs have not asserted the product was defectively manufactured, only that the warnings were inadequate, making the product defective. Plaintiffs have postured this case as a failure to warn case, both in terms of negligence and strict liability. However, plaintiffs then argue that "even if the labeling were the sole focus of the case, that would not exonerate Shire in this instance because Dr. Peterson's deposition is abundantly clear that he was not aware of and did not expect Adderall® to precipitate psychosis in Ryan Ehlis at normal, pre-scribed doses, which it did." *Id.*

In response to plaintiffs' motion, defendants assert Plaintiffs' Undisputed Facts are very much in dispute. Defendants dispute that the Adderall® at a prescribed dosage precipitated Ehlis's psychosis, asserting it was an overdose that precipitated the psychosis. Defendants cite to their medical expert in support of this contention, Dr. Pliszka. Plaintiffs challenge Dr. Pliszka's testimony and suggest a Daubert motion may be forthcoming, although they already have raised the issue in a Motion in Limine.[1] Further, defendants challenge the testimony of plaintiffs' experts, arguing that they have never been disclosed as experts and that defendants have never been provided proper reports, a point of considerable contention in later filings. Defendants assert that the only issue is failure to warn, and that plaintiffs "have

not presented any evidence whatsoever of any other theories of liability." Defendant Shire Richwood Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 9. As such, the focus is on the adequacy of the warnings, "not on whether Adderall® caused Ryan's psychosis." Defendant Shire Richwood Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 9. Finally, the parties address the presumption recognized in *Butz v. Werner,* 438 N.W.2d 509 (N.D.1989), that had an adequate instruction been given it would have been heeded. Defendants argue the warnings as given were adequate as a matter of law. Defendants further assert there is no evidence that Dr. Peterson would have acted differently if a different warning had been given, that Dr. Peterson was aware from his residency of the potential that amphetamines may cause psychosis, and that he continues to prescribe Adderall® to this day.

Defendants argue that "because the warning on the Adderall label is adequate as a matter of law, it could not have been the proximate cause of the shootings." Defendant Shire Richwood Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 21.

Defendants' final argument against summary judgment in favor of plaintiffs is that "the connection between a defendant's act or omission and the damage or injury suffered by the plaintiff may be broken by a superseding, intervening event." Defendants allege Angie Moreno's failure to take action when the effects of the Adderall® became apparent breaks the chain of causation and relieves Shire of any liability for plaintiffs' injuries, ultimately defeating plaintiffs' motion for partial summary

---

1. The remaining motions filed by the parties are moot as a result of the court's determination that defendants are entitled to summary

judgment on the basis of the learned intermediary doctrine.

judgment. Defendant argues that this superseding, intervening cause breaks the chain of causation. Defendant Shire Richwood Inc.'s Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment, at 9.

This court views this action as a failure to warn case, despite plaintiffs' attempts to argue defective product as a result of an inadequate warning. Because this court adopts the learned intermediary doctrine, and further finds that the warning was adequate as to Dr. Peterson, as more fully discussed below, Plaintiffs' Motion for Partial Summary Judgment must fail and is therefore DENIED.

II. Defendants' Motion for Summary Judgment.

Defendants assert no less than five theories by which they contend they are entitled to summary judgment. Although the court finds several of the theories persuasive, including the preemption theory raised by the defendants at the hearing, the court will first address the theory on which it "hangs its hat" in granting defendants' Motion for Summary Judgment, the learned intermediary doctrine.

A. No Duty to Warn the Ultimate User Under the Learned Intermediary Doctrine.

Plaintiffs assert not only that defendants failed to warn Ehlis of the dangers associated with the ingestion of Adderall®, but that the warnings associated with its use were inadequate as to Dr. Peterson as well. Defendants argue the learned intermediary doctrine obviates any inquiry into the adequacy of the warning to the patient and further that Dr. Peterson was well aware of the risks associated with prescribing Adderall®.

Since there are no North Dakota cases directly on point, the first line of inquiry is whether or not North Dakota would adopt the learned intermediary doctrine.[2] Counsel were specifically asked to advise the court of their positions as to whether North Dakota would adopt the learned intermediary doctrine if directly faced with the question, or whether certification of the question to the North Dakota Supreme Court would be appropriate. The court has concluded, taking into account the parties' arguments, the overwhelming majority of jurisdictions that have adopted the doctrine, and the fact that North Dakota has adopted § 402A of the Restatement (Second) of Torts, from which the learned intermediary doctrine derived, that North Dakota would recognize the learned intermediary doctrine as the rule of law in cases where the adequacy of the warning as to a prescription drug is at issue. See *Hill, v. Searle Laboratories*, 884 F.2d 1064, 1067 (8th Cir.1989) (Recognizing the existence of the learned intermediary doctrine in Arkansas). This position is further cemented by the court's holding in Hill wherein the Eighth Circuit Court of Appeals agreed with the district court and defendant Searle that "the Arkansas courts would join the majority of jurisdictions and adopt the defense to strict liability contained in comment k" to section 402A, recognizing the strength of Searle's argument that "the Arkansas Supreme Court has often referred to the comments of section 402A, implicitly adopting them." *Id.* at 1067. North Dakota courts also have adopted several comments to § 402A. See, e.g. *Crowston v. Goodyear Tire & Rubber*, 521 N.W.2d 401 (N.D.1994). Given the similarity in positions on the Restatement between North Dakota and Arkansas, and the Eighth Circuit Court of Appeal's willingness to permit the district

**2.** The parties generally agree that this issue must be decided under North Dakota law.

court to interpret state law, this court is confident North Dakota would similarly adopt the learned intermediary doctrine.

■ The learned intermediary doctrine provides the manufacturer has a duty to warn only the physician of the risks involved in the use of the pharmaceutical, and the physician then acts as the "learned intermediary" between the manufacturer and the patient. *Kirsch v. Picker International, Inc.*, 753 F.2d 670, 671 (8th Cir. 1985). Thus, a warning to the doctor is deemed a warning to the patient and there is no duty on the manufacturer to communicate directly with all ultimate users of the prescription drug. *Id.*

The second line of inquiry is whether Dr. Peterson was sufficiently aware of the risks associated with prescribing Adderall® to Ehlis. Courts are generally in agreement that a warning is adequate where it is reasonable under the circumstances. More specifically, courts have held that in order to be adequate the warning must satisfactorily convey the seriousness of the danger such that a reasonable physician would be alerted to the danger. 28 C.J.S., Drugs and Narcotics, § 62.

■ After careful review of the record, and particularly Dr. Peterson's deposition testimony, the court is convinced there could be no other conclusion but that Dr. Peterson knew the risks of prescribing Adderall® to Ehlis. Dr. Peterson's testimony is clear that he "appreciated that stimulants can cause psychosis as a side effect," although rarely. Deposition of Thomas Peterson, M.D., p.p. 25–26 (hereinafter Peterson Depo.). Dr. Peterson confirmed he reviewed the Physicians Desk Reference ("PDR") for Adderall® sometime prior to prescribing it to Ehlis and was aware of the potential side effects of Adderall®, including psychosis. Peterson Depo. p.p. 25–26. Dr. Peterson was also aware that substance induced psychosis "is within the DSM–IV." Peterson Depo. p. 26. Dr. Peterson also testified that he understood that "some people become psychotic without actually taking an overdose of the medication" and that this understanding applied to Adderall® as well as other amphetamines. Peterson Depo. p. 28. Further, Dr. Peterson testified that he was aware that the risk of psychosis was identified in the package insert at the time he prescribed the medication to Ehlis. Peterson Depo. p. 29. When asked about the accuracy of the statement in the package insert indicating that psychotic episodes at recommended doses are rare, Dr. Peterson testified he believed that to be an accurate statement. Peterson Depo. p. 34. Finally, Dr. Peterson testified that he will continue to prescribe Adderall® in the future, believing it to be a good medicine. Peterson Depo. p. 34.[3]

---

**3.** Plaintiffs actually concede the learned intermediary doctrine applies, but argue the Restatement (Third) of Torts would be embraced by North Dakota and that a codified exception is applicable, requiring the manufacturer to provide adequate warning to the patient directly "when the manufacturer knows or has reason to know that the health care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings." Restatement (Third) of Torts § 402. This position falls far wide of the mark because regardless of which Restatement applies, the exception cited is inapplicable. The exception is most oft cited in cases of mass inoculations and in circumstances where the physician has no direct contact with the patient. That is clearly not the situation here. Dr. Peterson testified he met with Ehlis for a period of time, and further stated he likely did advise Ehlis of some of the side effects, as is his normal practice to do. Peterson Depo. pp. 45–46. Therefore, under either Restatement, the court finds the learned intermediary doctrine applies.

There is simply no question Dr. Peterson understood the risks associated with prescribing Adderall® and voluntarily proceeded with an educated course of conduct. Unfortunately the effects were disastrous beyond anyone's comprehension, even the physician's. However, defendants are not legally responsible for the effect, having fulfilled their duty to adequately warn the physician of the risks associated with the use of Adderall®. Defendants' Motion for Summary Judgment is therefore GRANTED.

### B. Food, Drug and Cosmetic Act Does Not Provide a Private Right of Action.

Defendants argue they are entitled to summary judgment because the Food, Drug and Cosmetic Act does not provide for a private right of action. They contend that the plaintiffs' assertion that the labeling for Adderall® should contain a "black box" warning is an attempt to assert a private right of action under the FDCA, a claim not permitted under the Act. Plaintiffs assert they are not alleging a private right of action, but rather their claim is for negligence under North Dakota common law and strict liability as provided by statute. Plaintiffs further assert that "FDA approval is not shield to liability." *Hill v. Searle*, 884 F.2d 1064, 1067 (8th Cir.1989).

The Eighth Circuit, in *Brooks v. Howmedica*, recently held that a state failure to warn claim was preempted by § 306k of the Medical Device Amendments ("MDA") to the Food, Drug, and Cosmetics Act, prohibiting the plaintiff from claiming the manufacturer's instructions were inadequate. 273 F.3d 785, 791 (8th Cir.2001). Defendants assert this preemption would apply with respect to the labeling of Adderall® as well, citing the provisions of 21 C.F.R. § 314.70(c) for the proposition that the label may not be changed without FDA approval, except in limited circumstances, and then only temporarily if the supplement is not approved by the FDA. While the court agrees that the FDA provision "smacks" of preemption, unfortunately the determination is not nearly so "cut and dried," as can be seen from the Brooks court's exhaustive analysis of the Supreme Court's decision in *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) wherein the Court held that "State law will be preempted under the MDA when 'a particular state requirement threatens to interfere with a specific federal interest.'" *Brooks*, 273 F.3d at 793. The court in Brooks noted that "[t]he Court concluded that Lohr's failure to warn claim was too general to require preemption," *id.*, but that " 'any state common-law action that would impose a requirement different from, or in addition to' a specific federal requirement" would be preempted. *Id.* at 794 (citation omitted). In finding that Brooks' failure to warn claim would interfere or conflict with the specific federal requirements imposed during the regulation of the medical device, the court noted the extensive regulation of the label, stating "the FDA drafted or approved every word of the Simplex label, and any changes were subject to close FDA scrutiny." *Id.* at 795. This was not the case in Medtronic. Thus, the court reasoned that "[a] jury finding of negligent failure to warn would be premised on the fact that the label for Simplex was not written in a particular way or did not contain certain information. This would be equivalent to a state regulation imposing specific label requirements." *Id.* at 796. Further, the court noted, "The effect of a jury finding of negligent failure to warn would be that state law would require Howmedica (defendant) to change the label and package insert for Simplex (the product), but Howmedica may not unilaterally make such changes under federal law." *Id.* at 796.

As defendants point out, plaintiffs' claims in this case mirror those brought by Brooks, and although plaintiffs in oral argument attempted to distinguish the FDA from the MDA, the court is not convinced that preemption would not apply in this case. The FDA dictates the contents of the label for Adderall® and defendants were prohibited from changing it without prior approval from the FDA, except in limited circumstances for a limited period of time. This concept sounds in preemption, with the same rationale as adopted by the court in Brooks. Therefore, the court finds that summary judgment on this basis is also properly granted the defendants.

The final arguments asserted by defendants will be summarily addressed for the sake of completeness, given this court's dismissal on other grounds.

### C. Requisite Expert Testimony Lacking.

Defendants argue that plaintiffs have failed their burden of proof as they lack the requisite expert testimony. Defendants argue that the only expert identified by the plaintiffs, Donald H. Marks, M.D., is unable to provide the requisite testimony that the warning is inadequate, or that different labeling would have resulted in a different outcome. Defendants emphasize Dr. Marks' statement that it is common knowledge that this class of drugs causes psychosis as support for its proposition that Dr. Marks is unable to testify that changes to the warning would have resulted in a different outcome, and that to do so would be speculative.

In their reply brief defendants tie the "lack of requisite expert testimony" to North Dakota's rebuttable presumption against defects statute and the fact that plaintiffs cannot competently challenge the fact that the labeling for Adderall® complies with either FDA mandated labeling guidelines or industry standards.

The court will not grant defendants' summary judgment on this basis, concluding that Dr. Marks' testimony goes more to weight and credibility than it does to admissibility. Failure of proof based on the expert's testimony would be a question for the jury, if this action were proceeding.

### D. Failure to Rebut the Presumption Against Defects–N.D. Cent.Code § 28–01.3–09.

Defendants assert plaintiffs cannot rebut the presumption against defects contained in N.D. Cent.Code § 28–01.30–09. This section provides:

> There is a rebuttable presumption that a product is free of any defects or defective condition where the plans, designs, warnings, or instructions for the product or the methods and techniques of manufacturing, inspecting, and testing the product were in conformity with government standards established for that industry or where no government standards exist then with applicable industry standards, which were in existence at the time the plans, designs, warnings, or instructions for the product of the methods and techniques of manufacturing, inspecting, and testing the product were adopted.

N.D. Cent.Code § 28–01.3–09 (1995).

Defendants argue that plaintiffs have offered no evidence, including the testimony of their expert, that the labeling was anything but in complete compliance with applicable FDA regulations, the government standard. Thus, defendants argue the presumption has not been rebutted and they are entitled to summary judgment in their favor. Plaintiffs argue the labeling falls below the government standard, particularly in light of the fact that there is no warning about Adderall® triggering psychosis, at normal doses, in adult patients who have no prior history of psychosis. Plaintiffs thus argue that the

off-label use of Adderall® for the treatment of ADHD in adults suffices to rebut the presumption. In response, defendants argue that Adderall® is approved for prescription to adults with narcolepsy, and that the section of the warning that Adderall® can cause psychosis at recommended doses applies with equal force to children and adults.

The court will not grant summary judgment based on the rebuttable presumption; one that has been sufficiently challenged by raising the off-label prescription of Adderall® to adults. Plaintiffs have presented some evidence that defendant knew the drug was being so prescribed and had not sought FDA approval for this additional use. Thus, as to this use, the drug did not comply with the FDA standards and the presumption is thereby rebutted.

E. Injuries Suffered Were the Result of an Intervening, Superseding Cause.

Defendants argue that Angie Moreno's inaction when she realistically should have recognized the psychosis caused by the Adderall® was a superseding cause, breaking the chain of causation. In the court's view this is not a basis to deny liability, but may impact the extent of liability, if any. In this case there is no liability given the court's grant of summary judgment to the defendants on other grounds.

Conclusion

For the foregoing reasons, defendants' Motion to Clarify is GRANTED (Doc. # 68), plaintiffs' Motion for Summary Judgment is DENIED (Doc. # 63), and defendants' Motion for Summary Judgment is GRANTED (Doc. # 61). All other pending motions are hereby MOOT.